SPEICHER *v.* THOMPSON.

Contracts—Rescission—Fraud—Waiver.

> The right to rescind for fraud an exchange of property, by which complainants acquired the controlling interest in a corporation, is waived where, after learning of the indebtedness of the corporation which rendered it insolvent, and defendant's denial of misrepresentation in regard thereto, complainants determined to go on with the business, believing they could make themselves whole, and ultimately distributed the corporation's property to creditors.

Appeal from Benzie; Chittenden, J. Submitted October 13, 1905. (Docket No. 103.) Decided November 7, 1905.

Bill by Daniel J. Speicher and Samuel J. Speicher against William G. Thompson and David C. Thompson to rescind a contract for fraud. From a decree for complainants, defendants appeal. Reversed and bill dismissed without prejudice.

*Louisell & Nevius,* for complainants.

*Patchin & Crotser,* for defendants.

Ostrander, J. Complainants, brothers, exchanged a quantity of land situated in Benzie county, Mich., for 104 shares of the capital stock of the Thompson Milling Company, an Indiana corporation owning and operating a flouring mill at Wabash, Ind. The par value of the shares was $100; the authorized capital stock, $25,000. Only 200 shares of stock had been issued, of which defendants owned or otherwise secured and transferred to complainants the number of shares above stated. An agreement having been arrived at, the parties on November 6, 1902, reduced the same to writing, and executed

and acknowledged the written contract. The following is a copy of the written agreement:

" Memoranda of an agreement made and entered into by and between W. G. Thompson and D. C. Thompson, parties of the first part, and D. J. Speicher and S. J. Speicher, parties of the second part, all of the county of Wabash, in the State of Indiana, this sixth day of November, 1902, witnesseth:

" That the said parties of the first part have this day sold to the said parties of the second part 104 shares of the capital stock of the Thompson Milling Company, a corporation duly organized under the laws of the State of Indiana, at and for the following price and property, to wit: Said parties of the second part agree to convey to the said parties of the first part, by good and sufficient warranty deed, except a mortgage of $800 executed by Jacob Shenkle, to Case and Kratzer on or about the 28th day of June, 1902, which the said parties of the first part agree as a part of the purchase money to pay, seven hundred and fifty acres of land in Benzie county, Michigan, and to deliver to said parties of the first part a team of mares and one wagon, and a set of harness, and to pay said parties of the first part the sum of six hundred dollars in cash.

" The said second parties further agree to convey to the said parties of the first part about 8¼ acres of land in said county and State, subject to a contract given in relation to same for the sale of a part of same, and with the agreement on the part of the said parties of the first part that they will perform the terms and conditions of the said agreement aforesaid in relation to said land, and will save the said parties of the second part harmless on account of the same. The land agreed to be conveyed is described in five deeds now in the hands of J. D. Connors, Jr.

" Said parties of the first part are to have all of the standing and down timber upon said real estate. Said parties of the first part agree to bind themselves to turn over said capital stock free of all liens and incumbrances, and upon the representation which they agree to make good, that there are no liens or incumbrances against the real estate of the said The Thompson Milling Company, except a mortgage of the face value of $7,000 to the Building and Loan Association, a part of which has been paid. It is hereby agreed that the said parties of the second part are to become the owner of all the right, interest, and title of the said parties of the first part and of the interest of Car-

rie C. Thompson and Oma Morn, and all the property
and assets of the said parties of the first part in said The
Thompson Milling Company. It is further agreed that
the transfers of the said shares of the capital stock shall
be completed on the seventh day of November, 1903, and
in accordance with the constitution and by-laws of the
said corporation, and by proper authority; and that they,
said parties of the first part, will resign their office in said
corporation and have the said parties of the second part
substituted in their place as soon as said transfers of stock
are made. Said parties of the second part agree to per-
form their part of this contract within the next five
days, but will try to complete the same on the seventh
day of November, 1902, and, if the said parties of the
second part shall not be able to consummate this mat-
ter on the seventh inst., the said parties of the first part
shall have the same length of time as is taken by the
said second parties. The entire trade is to be consum-
mated by both parties, and all papers changed and deliv-
ered on the same day. Each party takes the property he
purchases of the other subject to the taxes of 1902.

" It is hereby agreed by and between the parties of this
contract, that if either party shall fail or refuse to fully
perform all the terms and conditions of this contract, he
shall, as liquidated damages, pay to the other party the
sum of fifteen hundred dollars.

" This agreement is made without any relief from val-
uation or appraisement laws.

" In testimony whereof we have hereunto set our hands
and seals the day and year first above written.

[Signed]          " W. G. THOMPSON.
                  " D. C. THOMPSON.
                  " D. J. SPEICHER.
                  " S. J. SPEICHER.

" STATE OF INDIANA, ⎫ ss. :
   Wabash County.    ⎰

" Before me, J. D. Connor, Jr., a notary public, within
and for said county and State, this sixth day of Novem-
ber, 1902, personally appeared the above named W. G.
Thompson, D. C. Thompson, D. J. Speicher and S. J.
Speicher, and acknowledged the execution of the above
and foregoing instrument.

" Witness my hand and notarial seal.

[Signed]          " J. D. CONNOR, Jr.,
                  " Notary Public."

On November 7, 1902, the exchange was completed, and defendants' positions as directors in the corporation were taken by the complainants, respectively. Thereafter complainants, as owners of a majority of stock, with the aid and assistance of the continuing secretary and treasurer of the company, managed the business, and defendants came to Michigan and took possession of the land.

On March 26, 1903, a bill of complaint, verified as of March 24, 1903, was filed in the Benzie county circuit court in chancery, upon which, but on what day in March the record does not disclose, a preliminary injunction was granted and was issued, which injunction forbade defendants selling or incumbering the said real estate, or from cutting, selling, or removing timber therefrom. A demurrer to the bill was filed and overruled, and thereafter, on September 16, 1903, defendants filed their joint answer. The cause came on for hearing in open court in June, 1904, and on August 16, 1904, the decree was entered from which defendants have appealed to this court.

The theory of the bill is that defendants obtained the real estate and other property of complainants by fraud and deceit and without consideration, the evil practices alleged consisting of representations and concealments of facts affecting the value of the shares of stock given to complainants; the stock being in fact worthless. A tender of the shares of stock to, and a refused demand for reconveyance of the land and other property from, defendants are averred. The bill prays for a decree requiring the defendants to reconvey the lands and pay back a sum of money paid to them in the transaction. It is also prayed "that your orators may be decreed damages for the loss sustained by reason of the fraud and deceit herein referred to." The decree does not find or support rescission of the contract and bargain. It does find that in the trade which was made a fraud was accomplished; that the stock was "comparatively worthless; that, by reason of the false and fraudulent representations so made by

141 MICH.—42.

said defendants to the complainants, the said complainants were defrauded thereby out of $5,478, over which this court in chancery has jurisdiction." The decree proceeds to give judgment against the defendants for the amount above recited, and costs of suit, and makes this sum a lien upon the said lands. It is further determined and decreed that, if the sum stated be not paid within 60 days after notice of the decree, "then the said transfer will be rescinded in full, and the entire transaction set aside and held for naught," and the decree in such case operates in terms as a retransfer of the lands to complainants; the complainants reassigning and transferring to defendants the said shares of stock. The injunction is made permanent.

The record, which is rather voluminous, has been examined with care. In the beginning complainants owned 769 acres of land, the title to which was in Samuel J. Speicher, subject to a mortgage upon some or all of it for $800. They had lived in Indiana all of their lives, and lived together. They bought the Michigan land in 1901. In the summer of 1902, Daniel J. Speicher spent some five months in Benzie county, and did some work on 22 acres of the land which was under cultivation. At this time the land was listed for sale with a real estate broker, known to both complainants, residing at Wabash, Ind. In October, 1902, Daniel paid his brother a visit, saw the real estate broker, and from him received information of a possible trade with defendants. This broker had the defendants' property, or the milling property, for sale, and brought the parties together on or about October 23, 1902. Complainants, to the broker, represented their land as worth from $7,000 to $7,500. With the agent, Daniel looked over the property of the milling company, met defendants, or one of them, had some general conversation, and returned to Michigan. One of the defendants came to Michigan on October 29th to look over the lands of complainants, returning October 30th, but saying nothing

about what he thought of the lands.   Daniel was on No-vember 3d summoned to Indiana by the real estate broker, and reached Wabash on November 5th, met the broker, went again to look over the property, and went again with his brother Samuel on the morning of November 6th. Later, on the same day, they went to the office of a lawyer, who prepared the memorandum of the agreement which they had made.

As to the various alleged false representations, and the fraudulent concealment of facts concerning the business, property, and indebtedness of the Thompson Milling Com-pany, which it is charged defendants are guilty of, and as to complainants' actual knowledge of conditions, there is conflicting testimony, rather evenly balanced as to num-ber of witnesses, their apparent character and standing, and as to the support given to the general theory and claim of each of the parties by such evidence as is undis-puted.   Considerable important testimony is in the form of depositions.   It will profit no one to rehearse or to com-pare the testimony.   The impression gained from reading the record is not one which is entirely favorable to com-plainants.    There is some evidence that complainants interpreted the contract to mean what it did not mean with respect to the force and effect of the words, " free of all liens and incumbrances, and upon the representation which they agree to make good," etc.   This evidence is found in part in the letter of December 8, 1902, written by complainants to defendants, hereinafter referred to. Neither party, however, proposes any theory or claim of rights based upon such a view of the testimony.   If the complainants are truthful, the defendants represented to them that the Thompson Milling Company owed no debts, except a mortgage upon the real estate, $290 accounts payable, and certain demands to persons who had stored or left wheat and received certificates therefor.   Defend-ants, also, in exhibiting the books of the concern, and in remarks and statements calculated to prevent inquiry, concealed the fact of a considerable indebtedness evidenced

by bills payable made by the company. There are other frauds charged, such as misrepresenting the capacity of the mill, the amount of wheat on hand, and the value in wheat of certificates outstanding; but the considerable fraud, resting upon facts concealed from complainants, which it is asserted rendered the stock worthless, and later caused suspension of business and liquidation, consisted of the deceit practiced about the debts of the concern. It is undisputed that there were outstanding, at the time the trade was made, a note for $1,000, dated July 14, 1902, due in 60 days; a note for $1,500, dated July 7, 1902, due in 90 days; a note for $1,300, dated April 10, 1902—upon which some $600 had been paid, all of them given by the Thompson Milling Company, and all of them signed, also, by one of the defendants. There were other notes outstanding, and an overdraft at the bank. When the note first above mentioned was presented on December 1, 1902, it was paid. When the second above-mentioned note was presented November 18, 1902, it was renewed and the renewal indorsed by one of the complainants. Correspondence followed, which is here set out:'

"WABASH, INDIANA, December 8th, 1902.
"Messrs. WILLIAM and DAVID THOMPSON.

"*Dear Sirs:* You will notice in our contract that you agreed to turn over to me your interest or 104 shares of the capital stock of the Thompson Milling Company free from all liens and incumbrances, and to make settlement for same as they appear. The Citizens' Bank has presented their note of fifteen hundred dollars, Mr. Bruner his note of one thousand dollars, Frank Bolander nine hundred dollars, Miss Ella Elliott her note of $325, interest collectible.

" I asked you in regard to this matter if the same was free from all such claims, and you both said it was, and upon this ground we expect to demand our claims. You know well I can't afford to let this matter pass unsettled. If you had given in these claims, it would have saved you this difficulty and me very much trouble. There is no record of these claims kept, and the mill, under its conditions, must speak by its records. Please attend to the matter at once. Our interests are affected to the

amount of $2,068 and interest.   Let us hear from you at once.

> "Yours truly,
> "D. J. and S. J. SPEICHER."

> "PRATTS, MICH., Dec. 15, 1902.

"Messrs. D. J. and S. J. SPEICHER.

" *Gentlemen:* Yours of December 7th was quite a surprise to us, both in the matter of your claimed ignorance of these notes against the Thompson Milling Co., and in your not seeming to appreciate the difference between ordinary notes and liens and mortgages.

" Now, it is a fact that you did know of the Citizens' Bank note from Mr. Hill himself, and from us also, and you did know of the Bolander note, as we together told you.   You also did know of the existence of the other claims, as we told you that the indebtedness would be more than the wheat and flour on hand and the book accounts, and we also told you that, if you wanted an exact statement of the condition of the Thompson Milling Co., you could get it of the secretary of the Co., or we would invoice, if you desired.

" Now, in regard to the contract will say, if you examine, you will see that it explicitly states that we agreed to turn over 104 shares of the stock free from liens or any incumbrances, which we did, as there isn't now, nor ever has been, any of these shares mortgaged or incumbered; and, further, you will remember that I explained our position.   We stated that, if we sold our shares to you, we stepped out and you stepped in, and the assets and liabilities still remained with the T. M. Co.

" Hoping you will see the situation as we fully explained it before we started, and as it really is, and that you may have a prosperous new year, we are,

> " Respectfully yours,
> " W. G. and D. C. THOMPSON."

The parties had no other communication with each other until this suit was begun.   Meantime, as detailed in the testimony of one of the complainants, the property of the Thompson Milling Company was attempted to be managed and business carried on.   The mill was a steam mill, and was, for some of this period, idle for want of fuel.   Finally the property was, by action of its officers, placed in the hands of a receiver or assignee, its affairs

·wound up, and a dividend of 74 or 75 cents paid upon each dollar of indebtedness.

"The demands on us were being made so strong and heavy that it was almost like a rush on a bank, and there was no money wherewith to pay, and the directors had called a meeting, and the directors discussed this matter pro and con and determined that was the best thing to do, and it was finally agreed upon by all of the directors present that we make an assignment to avoid litigation. Notice of litigation had already been given for the payment of a debt which a party claimed, and many threats for the payment of claims, if they were not immediately paid. And with all of this in view, to save the credit of the company, if possible, and to save the assets of the company from being eaten up by litigation, the directors, with other advice, deemed it best to pursue this course, so we made an assignment—the company did."

Daniel J. Speicher also testified as follows:

"*Q.* State whether, if at the time the assignment was made, you still thought there would be equity enough in there so the stockholders could receive some benefit from the proceeds of this company?

"*A.* Yes, sir; the directors thought that, by putting this into the hands of a trustee, we could avoid litigation and the business might be operated. I had counseled with Mr. Plummer, and he gave us legal counsel in the matter, and he advised these proceedings. He is judge of our circuit court there.

"*Q.* Now, after these debts and claims were all filed against the company, was there assets sufficient to pay them?

"*A.* No, sir.   *   *   *

"*Q.* State why, after learning of this indebtedness, you didn't then immediately proceed to take some action against the Thompsons to set aside the contract you had entered into at that time?

"*A.* Well, a short time after we had discovered the great amount of indebtedness, we saw that we had nothing to give them, that all the assets would be eaten up by the indebtedness.

"*Q.* State, if you know, what amount was paid on the claims.

"*A.* Seventy-four cents and something on the dollar.

" *Q.* Well, but before making the assignment, why didn't you take proceedings to set aside the relations that existed between you and the Thompsons by some process of law ?

" *A.* Well, we were advised by counsel that the facts set forth in the contract—that we would have to overrule the contract by evidence that all the facts were not set forth in the contract.

" *Q.* Well, did you have an idea that you would still get enough to make yourselves whole ?

" *A.* Yes, sir; we thought by pursuing this course we might save something. Even if we could not save it all, we would be willing to sacrifice even one-half, rather than go into any lengthy litigation to recover.

" *Q.* Well, when did you first know of the extent of the indebtedness of this company ?

" *A.* I think just a few days before I came up here and got out the injunction against the Thompsons.

" *Q.* Well, as soon as you ascertained the true state of affairs of the Thompson Milling Company financially, did you then immediately proceed to take steps to have this contract set aside ?

" *A.* Yes, sir.

" *Q.* That is, you commenced this action ?

" *A.* Yes, sir.

" *Q.* You followed your information by your action, did you ?

" *A.* Yes, sir.

" *Q.* You say that claims were filed that showed an indebtedness of about $16,000. Do you remember just how much the indebtedness was shown to be ?

" *A.* Not to a dollar, but $16,300 and something.

" *Q.* How much of that indebtedness was incurred subsequent to your deal with the defendants in this action on the 6th of November, while you were running it ?

" *A.* I think we had contracted debts to the amount of $1,100.

" *Q.* So at the time of the assignment there was $15,200 of that indebtedness that was outstanding against the company prior to your going into the institution ?

" *A.* Yes, sir.

" *Q.* Now, after you went into the company, and became a member of it, and operated this mill, how much of this indebtedness did you pay that had accrued against the company at that time ? How much of the old indebtedness did you pay ?

"*A.* We paid out old indebtedness some over $3,000.

"*Q.* Well, can you give it exactly?

"*A.* Not without making some reference to it, but it was close to $3,300 anyway.

" *Q.* So, approximately that would show that the company was owing $18,500, and you were apprised only of the mortgage of $7,000 on which they claimed to be $1,000 paid and $290 incidentals?

" *A.* That is all.

" *Q.* And that is all you supposed was owing by the company at that time?

"*A.* Yes, sir.

" *The Court:* I understood you to say awhile ago something about some wheat certificates. Do they figure in this $18,000?

"*A.* Yes, sir.

"*Mr. Warner:* It all does, your honor.

" *Q.* These figures here—this is the sum total of the whole business?

"*A.* Yes, sir."

And on cross-examination he testified:

" *Q.* Mr. Speicher, at this directors' meeting, December 24th, you say you talked over the best plan to save the property and to pay the creditors?

" *A.* Yes, sir.

" *Q.* You understood at that time that it was necessary to do something in order to save the company and save the company's property?

" *A.* Yes, sir.

" *Q.* Therefore you had this meeting for the purpose of considering this proposition?

" *A.* It was called for that express purpose.

"*Q.* And because you thought there was much danger that you might lose the whole plant, unless you took some decisive step?

"*A.* It was called for the purpose of making some arrangement to take care of these debts, or else make an assignment; yes, sir.

"*Q.* Well, now, if the condition of this company at that time was in that shape, and you understood it and knew that the meeting was called for that purpose, why didn't you then and there notify the Thompsons of this and make a tender of their stock to them—to return it?

"*A.* We didn't know the full amount of the indebted-

ness. We didn't know that the plant was in danger—so much so that all its assets would be completely exhausted by the creditors.

"*Q.* But you did know that you couldn't pay this indebtedness and keep afloat, unless you made an assignment or took some other move?

"*A.* Why, we were right up against it. The demands were being made on us so heavily that we couldn't possibly take care of these debts without making some arrangements to secure money or protect ourselves in some way."

As to rescission, complainants after discovering, by the presentation of the notes for payment, that they had been, as they claim, defrauded, and after learning from defendants that their asserted ignorance of the outstanding claims was disputed, believed they could still make themselves whole by proceeding with the business. In the brief filed for them it is said:

" We are well aware of the proposition of law for which defendants will doubtless contend, that, to rescind a contract for fraud, the wronged party must act promptly after discovering the fraud, and usually must place the other party in statu quo as a condition precedent. We do not dispute the long line of authorities that may be presented in support of this general proposition, but, like every general proposition of law, it is subject to exceptions under some circumstances. But, irrespective of any exceptions or modifications of the rule, we contend that complainants did not delay an unreasonable length of time before tendering back the stock received. The bill was filed in this case within less than five months after the contract with defendants was made, although the defendants were living in Michigan and complainants in Indiana. The tender was made, also, a short time after the complainants learned definitely of the insolvency of the company. Owing to the condition of the books, it took some time to learn the real condition of the business.

"No one could tell from the books what the company owed, and complainants could only learn that from time to time, as the creditors presented their claims. In case of farmers who had wheat deposited with the company, they would gradually find out the status of the company, and would not be apt to present their claims all at once,

or as promptly as others. Moreover, complainants were inexperienced boys engaged in farming prior to this venture, and did not know in what manner the defendants could be made to respond to them for fraud defendants had perpetrated on them. They were living in Indiana, and had no opportunity to get counsel with regard to the law prevailing in this State on the question at issue."

The elapsed time is not the only or the controlling fact. The law requires disaffirmance to be notified within a reasonable time. What length of time is reasonable depends upon all the conditions. Complainants were owners of a majority of the stock of the corporation, and were, also, managers of the business. They elected, and they so testify, to keep the stock and proceed with the business. They ran the mill about one-third of the time. The result was not profitable, and, the result being ascertained, they resort, not to a suit at law for their damages, but ask the aid of a court of equity to permit them to make a new election to recover their land and restore defendants their shares of stock. On December 1, 1902, and on December 8, 1902, defendants could have been restored as stockholders in a going concern, and could have taken up their business substantially as it was when they sold to complainants. It is said that the Thompson Milling Company was, all of the time, insolvent, and the shares of stock worthless. This statement is not supported by the record. Upon all the facts, the case is one requiring application of the familiar rule, so often stated and applied that, if the person defrauded—

" Be silent and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted." *Grymes* v. *Sanders*, 93 U. S. 62.

See, also, *Jewett* v. *Petit*, 4 Mich. 508; *Merrill* v. *Wilson*, 66 Mich. 232; *Carroll* v. *Rice*, Walk. Ch. (Mich.) 373.

The decree below is reversed without prejudice. A decree will be entered in this court dismissing the bill of complaint, with costs of both courts to defendants.

MOORE, C. J., McALVAY, GRANT, and BLAIR, JJ., concurred.